UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICHARD SHARNICK,                    :
  Plaintiff,                       :
                             :
v.                                   :   CIVIL No. 3:11CV945(AVC)
                             :
DENNIS D'ARCHANGELO and               :
FRANK A. PODPOLUCHA,                  :
  Defendants.                      :

RULING ON THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This is an action to recover compensatory damages and punitive damages to redress an alleged violation of the plaintiff's rights to freedom from false arrest, false imprisonment, and malicious prosecution. The plaintiff, Richard Sharnick, brings this action against Officer Dennis D'Archangelo and Detective Frank A. Podpolucha.  The defendants have each filed motions for summary judgment, arguing that they are entitled to judgment as a matter of law.  D'Archangelo's motion is DENIED and Podpolucha's motion is GRANTED.

FACTS

An examination of the complaint, pleadings, local rule 56 statements, exhibits accompanying the motions for summary judgment, and responses thereto, discloses the following undisputed facts:

At all times relevant to the conduct alleged in the complaint, the defendant, Dennis D'Archangelo, was a police

officer with the Oxford Police Department ("OPD"), and the defendant, Frank A. Podpolucha, was a detective with the Bridgeport Police Department ("BPD").

From September 12, 1996 through to June 14, 2005, the plaintiff, Richard Sharnick, owned Connecticut Avenue Auto Sales, LLC.  The business primarily performed auto repairs and sales on the premises at 1140 Connecticut Avenue.  Sharnick also owned the property at 1140 Connecticut Avenue.  On September 12, 1996, Connecticut Avenue Auto Sales, LLC registered with the Connecticut Secretary of State.  On June 14, 2005, Sharnick sold the business and real estate.  The new owners reopened the business under a new name, Connecticut Avenue Auto Body.  Since the sale of the business, Sharnick has not been involved in the operation of Connecticut Auto Sales or Connecticut Avenue Auto Body.

According to Podpolucha,[1] on February 11, 2008, Podpolucha met with Mr. Fawad H. Malick, Controller of BMW of Bridgeport, regarding a check that was returned with insufficient funds.  As Controller of BMW of Bridgeport, Malick has personal knowledge of Sharnick's Bridgeport BMW customer account.  Specifically,

---

[1] In Sharnick's responses to Podpolucha's statement of fact, Sharnick states in a footnote that Podpolucha "has submitted voluminous affidavits regarding the investigation that [Sharnick] has no knowledge of and thus cannot admit or deny."  Sharnick's Local Rule 56(a)2 Statement regarding Podpolucha's Motion for Summary Judgment is riddled with responses that indicate Sharnick is "Unable to admit or deny and leaves the defendant to his proof."  These answers make it very difficult to produce a summary of facts sufficient on behalf of both parties.  Even though Sharnick had over twelve weeks to respond appropriately to the facts from the affidavits, this court remains mindful that the facts asserted by Podpolucha are his only.

Malick informed Podpolucha that Sharnick owned Connecticut Avenue Auto Sales and purchased auto parts from the dealership with a check that had insufficient funds.  Sharnick never personally contacted Malick or anyone at Bridgeport BMW to inform the company that he no longer owned Connecticut Avenue Auto Sales.

Malick provided Podpolucha with a copy of a BMW of Bridgeport invoice that listed "Connecticut Auto Sales, Richard Sharnick" as the recipient of auto parts sold on January 4, 2008.  The invoice, however, also indicated "Ship to James." Malick informed Podpolucha that "Sharnick was the customer and person responsible for payment for auto parts purchased on his account."  The Connecticut Avenue Auto Body check was written in the amount of $5,061.25 and stamped "RETURN REASON – A NOT SUFFICIENT FUNDS."

The parties dispute facts pertaining to the signature on the check.  Podpolucha argues that the signature on the check is illegible while Sharnick contends that it is unmistakably signed "Noor."

Overall, Malick identified Sharnick as the individual responsible for the bad check and requested his arrest. Podpolucha provided Malick with an "Eight Day Letter" to be mailed to Sharnick, which required he pay the balance on the check or an arrest warrant would be issued.  On February 11,

2008, Malick completed this form and sent it via the United States Postal Service to Connecticut Avenue Auto Body.  On February 14, 2008, "James" at Connecticut Avenue Auto Body received and signed the return receipt for the "Eight Day Letter."

After the meeting with Malick on February 11, 2008, Podpolucha called and left a voice message for Sharnick at the number listed on the BMW invoice.  Since Podpolucha noticed a slight difference between the name on the check and the name on the invoice, he proceeded to search Concord, the Connecticut Secretary of State business website, for either Connecticut Avenue Auto Body and Connecticut Avenue Auto Sales.  Podpolucha discovered that the website did not list Connecticut Avenue Auto Body.  Instead, the website listed Richard Sharnick as the owner of Connecticut Avenue Auto Sales, LLC.  Furthermore, it described the "Business Status" as "Active."

In the following months, Podpolucha attempted numerous times to call Sharnick's business number and received no response.  He also visited the business location multiple times to no avail.  On one occasion, a man identified as "James" told Podpolucha that he was an employee and that Sharnick owned the property and ran the Connecticut Avenue Auto Body business.

In April 2008, Vincent DePalma, a manager at Miller Ford/Nissan, contacted BPD to report a check from Connecticut

4

Avenue Auto Body that had insufficient funds.  Podpolucha met
with DePalma, who explained that Sharnick used a Miller
Ford/Nissan account to purchase auto body parts for his
business.  Throughout the interview, DePalma confirmed multiple
times that Sharnick owned Connecticut Avenue Auto Body.

"Based upon the information revealed in his investigation
to date, including information provided by the victim, two
independent witnesses/sources, the Secretary of State website as
well as the lack of responses from [his] telephone inquiries and
site visit," Podpolucha prepared an arrest warrant application
and contacted Malick.  On April 9, 2008, Malick reviewed the
warrant application and signed the affidavit under oath and in
Podpolucha's presence.  On April 11, 2008, Assistant State's
Attorney Craig Nowak signed the arrest warrant application.  On
April 15, 2008, Judge Keegan found probable cause for the arrest
and signed the arrest warrant application.

After multiple unsuccessful attempts to serve the warrant
on Sharnick, Podpolucha filed it with Connecticut records.
According to Rick Siena, the plaintiff's expert in police
practices, Podpolucha "should have gone a few steps further to
confirm his information that he was looking at and that he
essentially acted on as far as applying for a warrant."
Podpolucha should have also taken his investigation "a little

bit further and confirm the information through the Secretary of State as to who actually own[ed] the business."

On February 13, 2010, D'Archangelo was on duty and patrolling the town of Oxford.  At approximately 4:51 p.m., D'Archangelo observed a gray Chevrolet Silverado and conducted a routine registration check on the motor vehicle.  The check revealed that Sharnick owned the vehicle and had an outstanding arrest warrant out of Bridgeport, Connecticut.  At approximately 5:02 p.m., Officer D'Archangelo stopped the motor vehicle based on the information from the warrant.

After confirming that Sharnick was the operator of the vehicle, D'Archangelo contacted the BPD to verify the outstanding warrant.  Once BPD confirmed the warrant, D'Archangelo arranged to transport Sharnick to a commuter parking lot in Monroe, Connecticut, in order to transfer him to the custody of the BPD.  D'Archangelo then handcuffed Sharnick and sat him in the front passenger's seat of the police cruiser. Podpolucha was not present when Sharnick was stopped, arrested, handcuffed, transported to Monroe, transported to BPD, or processed in BPD.

The parties dispute the details of the handcuffing. Sharnick claims that he sustained an injury to his right wrist as a result of the handcuffs tightening while being transported to the commuter parking lot.  D'Archangelo states that he

"double locked the handcuffs and checked for fit by placing a finger between the cuffs and the plaintiff's wrists."  According to Siena, this handcuffing procedure "prevents the handcuffs from tightening accidentally during the subsequent transportation of an arrestee."  Furthermore, D'Archangelo contends that Sharnick did not complain about the tightness of the handcuffs at the time of handcuffing.

On the other hand, Sharnick argues that the double lock procedure was not applied to him.  Sharnick avers that he complained about the tightness of the handcuffs ten minutes after the initial handcuffing.  "[D]uring transport[,] the hand cuffs [sic] kept tightening on [Sharnick], causing him considerable pain and he again asked for the cuffs [sic] to be loosened but Officer D'Archangelo refused to stop the cruiser."  Consequently, Sharnick "cried out in pain from the cuffs [sic] and asked for the cuffs [sic] to be loosened."

Both parties admit that D'Archangelo lawfully arrested Sharnick based on the outstanding warrant, and that he never pushed, hit, or used any physical force against Sharnick.  Furthermore, D'Archangelo was the only police officer present at the time of the arrest and transport, and Sharnick did not observe the manner in which D'Archangelo handcuffed him.

At approximately 5:34 p.m., D'Archangelo arrived at the commuter parking lot.  He removed his handcuffs from Sharnick

7

and transferred Sharnick to the custody of two BPD officers.
Sharnick was handcuffed again and transported to BPD.

Both parties admit that Sharnick failed to complain about
any discomfort when he was transferred to BPD at the commuter
parking lot, nor did he mention any soreness during his
subsequent processing at BPD.  Furthermore, the parties agree
that there were no visible scratches, marks, or blood on
Sharnick's wrists when the BPD removed his handcuffs, nor did
Sharnick seek any emergency medical treatment.

On February 23, 2010, Sharnick sought medical attention
from Dr. K. N. Sena.  On the new patient background information
form, Sharnick wrote that he complained of soreness in his left
thumb.  Dr. Sena's report stated that "[a]ccording to
[Sharnick], the handcuff [sic] were tight and pressing and
uncomfortable.  He requested loose handcuffs from the police
officer.  Since then, he has been experiencing a sensation of
numbness and tingling along the dorsum of the thumb and toward
the left finger."  At present, Sharnick claims that he sustained
an injury to his right wrist only.  Dr. Sena did not prescribe
any medication or any treatment to Sharnick in connection with
the alleged injury.  Apart from subsequent testing on March 10,
2010, with Dr. Lawrence Beck, a neurological specialist,
Sharnick has had no follow-up visits with Dr. Sena or any other
medical professional in connection to the alleged injury.

**DISCUSSION**

I.  **Detective Podpolucha**

  A. **Section 1983 Claims**

The defendant Podpolucha argues that Sharnick's claims for
false arrest and malicious prosecution fail on the facts of this
case.  Specifically, Podpolucha argues that the warrant
application was supported by probable cause.  In addition, he
states that there is no evidence of the requisite malice to
support the malicious prosecution claim.

Regarding the false arrest claim, Sharnick responds that
there was no probable cause to arrest him.  He challenges the
"trustworthiness" of the Bridgeport BMW information and the name
"James" that was indicated on the BMW invoice.  Specifically,
Sharnick states that "[t]here appears to have been massive
confusion, and reckless disregard for the truth, if not outright
deception by BMW and 'James.'"  With respect to the malicious
prosecution claim, Sharnick relies on his "assertion that
probable cause was lacking for his arrest."

The amended complaint alleges that Podpolucha violated
Sharnick's right to be free from false arrest and malicious
prosecution in violation of the Fourth Amendment and 42 U.S.C. §
1983.  42 U.S.C section 1983 provides that "any person who,
acting under color of law, 'subjects or causes to be subjected,

10

any Citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws' of the United States shall be liable to the injured party in actions at law." Shattuck v. Stratford, 233 F.Supp.2d 301, 306 (D. Conn. 2002) (quoting 42 U.S.C.§ 1983). The Fourth Amendment protects the right to be free from arrests without probable cause.[2] "Claims for false arrest or malicious prosecution, brought under § 1983, to vindicate the Fourth and Fourteenth Amendment right to be free from unreasonable seizures, are 'substantially the same' as claims for false arrest or malicious prosecution under state law." Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). The elements to establish claims for false arrest and malicious prosecution under section 1983 are controlled by state law. See Davis v. Rodriguez, 364 F.3d 424, 433 (2d Cir. 2004); Cook v. Sheldon, 41 F.3d 73, 79 (2d Cir. 1994).

To bring a section 1983 claim for false arrest, a plaintiff must establish: "(1) the defendant intentionally arrested him or had him arrested; (2) the plaintiff was aware of the arrest; (3) there was no consent to the arrest; and (4) the arrest was not supported by probable cause." Weinstock v. Wilk, 296 F. Supp.

---

[2] The Fourth Amendment provides that "[t]he right of people to be secure in their persons . . . , against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause . . . ." U.S. Const. Amend. IV.

2d 241, 246 (D. Conn. 2003).  A section 1983 malicious
prosecution claim requires the plaintiff to demonstrate "a
violation of his rights under the Fourth Amendment . . . and
establish the elements of a malicious prosecution under state
law."  Fulton v. Robinson, 289 F.3d 188, 195 (2d Cir. 2002)
(citations omitted).  To establish malicious prosecution in
Connecticut, the plaintiff must establish the "'initiation or
procurement of the initiation of criminal prosecution with
malice for a purpose other than bringing an offender to justice;
that the defendant acted without probable cause, and the
criminal proceedings terminated in favor of the plaintiff.'"
Shattuck, 233 F. Supp.2d at 306 (quoting Clark v. Greenwich, No.
CV00177986, 2002 WL 237854, at *3 (Conn. Super. Jan. 24, 2002));
see also QSP, Inc. v. Aetna Casualty and Surety Co., 256 Conn.
343, 361 (2001); Rohman v. New York City Transit Authority, 215
F.3d 208, 215 (2d Cir. 2000) (holding that in addition to the
state requirements for a malicious prosecution action, under
section 1983, a plaintiff must also demonstrate "a sufficient
post-arraignment liberty interest restraint . . . .").
Therefore, "if probable cause existed for the arrest, the
plaintiffs cannot satisfy the elements of either a false arrest
claim or a malicious prosecution claim under § 1983."  Shattuck,
233 F. Supp.2d at 307.  Because "the existence of probable cause
is a complete defense to a civil rights claim alleging false

arrest or malicious prosecution," <u>Garcia v. Gasparri</u>, 193 F. Supp.2d 445, 449 (D. Conn. 2002) (citing <u>Curley v. Suffern</u>, 268 F.3d 65, 69-70 (2d Cir. 2001)), the determination with respect to probable cause is central to both claims.  <u>Id.</u>

Under the circumstances of this case, the plaintiff's expert witness, Rick Siena, testified that Podpolucha "should have gone a few steps further to confirm his information that he was looking at and that he essentially acted on as far as applying for a warrant."  Viewing, as it must, all inferences and ambiguities in a light most favorable to the nonmoving party, <u>see</u> <u>Bryant v. Maffucci</u>, 923 F.2d 979, 982 (2d Cir. 1991), <u>cert.</u> <u>denied</u>, 502 U.S. 849 (1991), the court concludes that issues regarding probable cause must be decided after the presentation of evidence, at the time of trial.  Therefore, the defendants' motion for summary judgment with respect to these claims is denied.

B. **Qualified Immunity**

Podpolucha next argues that he is entitled to qualified immunity with respect to the claims against him.  Specifically, he contends that "[e]ven if the Court finds that Detective Podpolucha did not have actual probable cause to pursue the arrest warrant for Richard Sharnick, he had arguable probable cause to do so . . . ."

Sharnick responds that Podpolucha is not entitled to qualified immunity because "material facts are in dispute." Specifically, Sharnick contends that "[t]he material facts being in disputed [sic], qualified immunity is not available on summary judgment."

The doctrine of qualified immunity balances two important interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).

According to the second circuit, when a plaintiff sues an official in his or her individual capacity, the qualified immunity doctrine shields the defendant from civil liability for money damages "if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." Bizarro v. Miranda, 394 F.3d 82, 85–86 (2d Cir. 2005) (quoting Poe v. Leonard, 282 F.3d 123, 132 (2d Cir. 2002)). The second circuit considers the following three factors in determining whether a particular right was clearly established: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable Circuit Court support the existence of the right in question; and (3) whether under

14

preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." Everitt v. DeMarco, 704 F. Supp. 2d 122, 136 (2d Cir. 2010) (quoting Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991)); see also Saucier v. Katz, 533 U.S. 194, 202 (2001) (holding that "[t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."). Therefore, in light of pre-existing law, "the unlawfulness of the action in question must be apparent," Wilson v. Layne, 526 U.S. 603, 615 (1999), so that "a reasonable official would understand that what he is doing violates that right," Anderson v. Creighton, 483 U.S. 635, 640 (1987); Connell v. Signoracci, 153 F.3d 74, 90 (2d Cir. 1998).

Ultimately, "[t]he question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in the defendant's position should know about the constitutionality of the conduct." McCullough v. Wyandanch Union Free Sch., 187 F.3d 272, 278 (2d. Cir. 1999). If the law was "clearly established, the [qualified] immunity defense ordinarily . . . fail[s], since a reasonably competent official should know the law governing his conduct." Harlow v. Fitzgerald, 457 U.S. 800, 818-19 (1982).

Although qualified immunity is a question of law, if there is a dispute of fact as to the officer's conduct, "the factual questions must be resolved by the factfinder" before qualified immunity can be determined.  Zellner v. Summerlin, 494 F.3d 344, 368 (2d Cir. 2007).  "Where the circumstances are in dispute, and contrasting accounts present factual issues . . . a defendant is not entitled to judgment as a matter of law on a defense of qualified immunity."  Curry v. City of Syracuse, 316 F.3d 324, 334 (2d Cir. 2003).

Although there may be an issue of material fact with the underlying false arrest claim, it appears that Podpolucha had "arguable probable cause" to arrest Sharnick.  According to the second circuit, "[e]ven if probable cause to arrest is ultimately found not to have existed, an arresting officer will be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest."  Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004).  "Arguable probable cause exists 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.'"  Id. (quoting Golino v. New Haven, 950 F.2d 864, 870 (2d Cir. 1991)).  "Thus, the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause;

16

'arguable probable cause' will suffice to confer qualified immunity for the arrest."  <u>Escalera</u>, 361 F.3d at 743.

In reviewing the warrant application and the totality of the circumstances leading up to Sharnick's arrest, including but not limited to the information indicating Sharnick on the BMW invoice; the identification of Sharnick as the customer responsible for an insufficient check by BMW Controller Fawad Malick; the identification of Sharnick as the customer responsible for an insufficient check by Vincent Depalma of Miller Nissan; the identification of Sharnick as the owner and operator of the business at 1140 Connecticut Avenue by a witness, "James;" Malick's signed affidavit in support of Sharnick's arrest; the signed warrant application by an Assistant State's Attorney and neutral magistrate judge; and the confirmation that Sharnick owned and registered "Connecticut Avenue Sales, LLC" on the Connecticut Secretary of State website; this court concludes that there was arguable probable cause for purposes of the qualified immunity doctrine.  Since arguable probable cause existed for Sharnick's arrest, Podpolucha is entitled to qualified immunity from the claims for false arrest and malicious prosecution.  Therefore, Podpolucha's motion for summary judgment on those claims is GRANTED.

**II.   Officer D'Archangelo**

Officer D'Archangelo moves for summary judgment on the issue of excessive force, arguing that the alleged use of force was objectively reasonable under the circumstances. Specifically D'Archangelo states that "there is simply no objective evidence that Officer D'Archangelo placed the handcuffs too tight, that he could have known that the handcuffs were too tight, or that the plaintiff suffered his alleged injury as a result of Officer D'Archangelo's handcuffing." Sharnick responds that "the use of force was not objectively reasonable."

The United States Supreme Court has held that "all claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest . . . should be analyzed under the Fourth Amendment and its 'reasonableness' standard." Graham v. Connor, 490 U.S. 386, 395 (1989).  Under Graham, "the 'reasonableness' inquiry in an excessive force case is an objective one, asking whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.  Id. at 396; see also Brower v. County of Inyo, 489 U.S. 593, 599 (1989).  Furthermore, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 395 (citing Terry v.

18

Ohio, 392 U.S. 1, 20-22 (1968)).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."  Id. at 396-97; see also Saucier v. Katz, 533 U.S. 194, 210-11 (2001) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment.").

The Supreme Court explained that the proper application of the reasonableness test "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham, 490 U.S. at 396; see also Amnesty v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004); Mills v. Fenger, 216 F. App'x 7, 8 (2d Cir. 2006).  If an officer reasonably, but mistakenly, believed that a suspect was likely to fight back, for instance, the officer would be justified in using more force than in fact was needed.  Saucier v. Katz, 533 U.S. 194, 205 (2001); see also Sullivan v. Gagnier, 225 F.3d 161, 165-66 (2d Cir. 2000).

While reasonableness is traditionally a question of fact for the jury, "defendants can still win on summary judgment if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994); see Curry v. City of Syracuse, 316 F.3d 324, 332 (2d Cir. 2003).

On the other hand, where the parties version of the facts differ significantly, "[t]he issue of excessive force is . . . for the jury, whose unique task it is to determine the amount of excessive force used, the seriousness of the injuries, and the objective reasonableness of the officer's conduct." Breen v. Garrison, 169 F.3d 152, 153 (2d Cir. 1999); see also George v. Town of East Hartford, No. 3:97CV1958 (RNC), 2000 WL 436605, at *2 (D. Conn. Mar. 13, 2000) (finding that an excessive force claim against a police dog's handler survived motion for summary judgment where the plaintiff alleged that the dog continued to attack him even after he was caught and offered no further resistance, while defendants version of the events differed significantly); Henry v. City of New York, No. 02 Civ. 4824 (JSM), 2003 WL 22077469, at *2 (S.D.N.Y. Sept. 8, 2003) (holding that "where there is a factual dispute about the circumstances surrounding arrest and the degree of force used, the second

circuit requires a jury determination of the reasonableness of that force.").

"Although handcuffs must be reasonably tight to be effective, . . . overly tight handcuffing can constitute excessive force . . . .  [I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiff's] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists*."  Ferraresso v. Town of Granby, 646 F. Supp. 2d 296, 306 (D. Conn. 2009) (emphasis in original) (quoting Lynch ex rel. Lynch v. City of Mt. Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (internal quotation marks omitted).  In considering these factors, the issue is "whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."  Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005); see also Ferraresso, 646 F.Supp. 2d at 306.

There is are two factual disputes: (1) Whether D'Archangelo double locked the handcuffs after initially arresting Sharnick in order to prevent the handcuffs from tightening around Sharnick's wrists; and (2) whether D'Archangelo ignored Sharnick's complaints of tight handcuffs during the transport. Assuming the truth of Sharnick's statements, as the court is

obliged to do on summary judgment, a rational jury could certainly find that D'Archangelo used excessive force when he allegedly failed to double lock the handcuffs, and allegedly did not stop the police cruiser when Sharnick "cried out" in pain. In light of the substantially different versions of events, a material issue of fact exists as to the reasonableness of D'Archangelo's actions under the circumstances, which precludes summary judgment on the merits of the claim. Here, viewing the factual disputes, as it must, in the light most favorable to the plaintiff, the court cannot find as a matter of law that Officer D'Archangelo's use of force against Sharnick was objectively reasonable.

Next, D'Archangelo argues that Sharnick has not demonstrated a constitutionally compensable injury. Specifically, D'Archangelo contends that Sharnick's medical expert, Dr. Sena, testified that "the superficial radial neuropathy that is claimed by [Sharnick] in this case is a *de minimus* injury that requires no treatment, was expected to heal with time and should not have impaired the plaintiff's ability to engage in his regular physical activities." Furthermore, D'Archangelo maintains that Sharnick "has not taken any medication in connection with the injury and has not sought any treatment following the plaintiff's February 10, 2010 visit to Dr. Sena and March 10, 2010 testing."

22

It is difficult to ascertain Sharnick's response to D'Archangelo's argument.  While Sharnick lists a "sampling of the medical literature" regarding "handcuff neuropathy," these sources do not adequately respond to Sharnick's contention that any alleged injury Sharnick sustained is minor and not compensable.

"In order to sustain a claim for excessive force, the Plaintiff must establish through evidence, that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable and, consequently, that the amount of force used was more than *de minim[i]s*."  Phelps v. Szubinski, 577 F. Supp. 2d 650, 661-62 (E.D.N.Y. 2008); see also United States v. Walsh, 194 F.3d 37, 50 (2d Cir. 1999) (requiring a demonstration of a deprivation that is objectively sufficiently serious or harmful enough); Ferraresso, 646 F. Supp. 2d at 307. Importantly, this case law focuses on whether the force used was *de minimis*, rather than whether the alleged injury was *de minimis*.  In fact, the second circuit has reasoned that "a litigant is entitled to an award of nominal damages upon proof of a violation of a substantive constitutional right even in the absence of actual compensable injury."  Amato v. City of Saratoga Springs, N.Y., 170 F.3d 311, 317 (2d Cir. 1999); see also Smith v. Coughlin, 748 F.2d 783, 789 (2d Cir. 1984) (holding that "even when a litigant fails to prove actual

compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitutional right.").

Even though the evidence of Sharnick's alleged injuries in this case is weak, there is still an issue of material fact as to whether D'Archangelo used excessive force in handcuffing Sharnick.  Construing the facts in the light most favorable to Sharnick, D'Archangelo potentially violated his constitutional rights by failing to double lock the handcuffs and by ignoring his pleas to loosen the handcuffs.  Therefore, D'Archangelo's motion for summary judgment on Sharnick's excessive force claim is DENIED.

<u>**Conclusion**</u>

For the foregoing reasons, the defendants' motions for summary judgment are GRANTED.

It is so ordered this 22nd day of March 2013, at Hartford, Connecticut.

_____/s/_____
Alfred V. Covello,
United States District Judge